

**ROBERT STANLEY
COURT REPORTING, INC.**
Post Office Box 3079
St. George, Utah 84771
(435) 688-7844
Fax (435) 628-3575
e-mail: rstanleyrpr@msn.com

**ROBERT STANLEY**
Court Reporting

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

---oooOooo---

CEQUENT TRAILER PRODUCTS, INC.,    )
                                   )  Civil Action No.
            Plaintiff,             )  05-CV-0074 (NAM/GJD)
                                   )
        vs.                        )  Deposition of:
                                   )
DIVERSI-TECH, CORP.,               )  **PAUL WILLIAM BUDGE**
                                   )
            Defendant.             )
_____)

COPY

        The deposition of **PAUL WILLIAM BUDGE**, a
witness in the above-entitled cause, taken at the
instance of the Plaintiff, at the law offices of
Durham Jones & Pinegar, 192 East 200 North, Third
Floor, St. George, Utah, on Thursday, August 11, 2005
at the hour of 9:02 a.m., before Robert D. Stanley,
Certified Shorthand Reporter, Registered Professional
Reporter, and Notary Public in and for the State of
Utah

            ---oooOooo---

1    taken the prototype to try it on their trailers on

2    their lots.

3            So whether they saw it or indirectly saw

4    it, I don't know.  TJ's U-Haul and Dixie Automotive

5    they saw it because they kept the samples.  So those

6    are for sure.  The others aren't.

7        Q.    And what do you mean by "aren't"?  In

8    other words --

9        A.    The other witnesses didn't directly keep

10   the product.  They didn't have a working knowledge of

11   it.

12           MR. MULDOON:  Let him finish the question

13   before you answer, okay?

14           THE WITNESS:  Sorry.  Sorry about that.

15   Go ahead.

16       Q.    BY MR. CUPAR:  Oh, no, that's okay.

17           Did you -- well, let me go back, just so

18   I'm clear on sort of time lines here.

19           The entities that you just named, the list

20   of five, six, seven entities, did you show each of

21   them?  Or did you present at each of these facilities

22   this prototype prior to August 28th, 2000?

23           MR. MULDOON:  Objection to form, compound.

24           THE WITNESS:  Most likely I tested this

25   product at all of these facilities, these dealers I

1    mentioned.  I had taken the lock around and done some

2    of my testing.  When I was done with my testing I

3    took the lock back and let TJ's U-Haul and Dixie

4    Automotive keep possession of the sample for test

5    marketing.

6         Q.    Okay.

7         A.    And they went out and showed it to the

8    customers as potentially trying to get sales on the

9    product.

10        Q.    Okay.  And how do you know that all of

11   those activities occurred prior to August 28th, 2000?

12        A.    Because I was worried that I was showing

13   too many people the product and that I needed to

14   protect it or prove a date on it.  So I took one of

15   the drawings I had, photocopied it, took it in, had

16   Diane McDaniel sign, notarize, the document that I

17   actually had the design and I developed it myself.

18        Q.    Okay.  And you said you took one of the

19   copies to Diane McDaniel.  Were there other documents

20   at that time that you had in regards to this coupler

21   lock?

22        A.    There was an original drawing to this that

23   was hand drawn in pencil.  This is a photocopy of a

24   pencil drawing.  I don't think it's a good idea to

25   notarize a pencil drawing.  So I photocopied the

1   drawing so that she wasn't notarizing something with

2   pencil that could be erased and re-drawn.  So this is

3   a photocopy of a drawing of the coupler lock.

4        Q.      Okay.  So, in other words, it's a

5   photocopy of an original?

6        A.      Of an original drawing.

7        Q.      And do you have that original drawing?

8        A.      I couldn't find it.

9        Q.      Do you have any other documents, let's

10  say, between April 10, 2000 and August 28, 2000, in

11  regards to your coupler lock?

12       A.      I don't.

13               THE WITNESS:  Unless you have it.  I have

14  given all the information to my counsel.

15       Q.      BY MR. CUPAR:  Okay.

16       A.      So if it's not here in evidence, it's

17  probably not in existence, to my knowledge.

18       Q.      Okay.  Now, going back to the other

19  entities other than Dixie's and TJ's, and in order to

20  not make this a memory test for you, I'm going to

21  refer your attention to paragraph 11 of your

22  declaration.

23       A.      Okay.

24       Q.      Are those the entities that you tested

25  these coupler locks at prior to August 28th, 2000?

1      A.    I did most of the initial testing here in

2   St. George.

3      Q.    Okay.  And what about Petersen Marine,

4   what did you do there?

5      A.    I took a trip to Salt Lake and briefly

6   went -- took the lock to a few dealerships to try it

7   on several trailers that might not have been found

8   here in St. George.  We sometimes don't carry

9   everything or every style.  So I needed to go to Salt

10  Lake to make sure that there wasn't some odd-ball

11  trailers that I needed to get dimensions off of to

12  start improving my product.

13     Q.    Okay.  And how many times did you go up to

14  Petersen's?

15     A.    During that time frame?

16     Q.    Yes.  Yeah, right.  Well, let's -- because

17  I don't know what that time frame is.  What time

18  frame are you talking about?

19     A.    Are you talking about the April to August

20  2000 time frame?

21     Q.    Yes.

22     A.    One time.

23     Q.    Okay.  And when was that exactly?

24     A.    It seems like it was a week or two before

25  this was notarized.

1    completely worked.  There was parts and pieces at the

2    time.  Maybe not enough to build a third.  I don't

3    know.  Like I said, there was a lot of different

4    variations and things I was tinkering with.  There

5    was definitely two completed prototype locks.

6        Q.     And when did you build -- well, let me

7    back up.

8               Did you build those two prototypes at the

9    same time?

10       A.     Pretty much.

11       Q.     Okay.

12       A.     Within a close time frame, yeah.

13       Q.     And how close a time frame?

14       A.     Within a month.

15       Q.     Okay.

16       A.     To the best of my knowledge.

17       Q.     Right.  And the reason I'm asking, just to

18   be clear is, was there a lapse of time between the

19   first prototype being built and the second prototype

20   being built?

21       A.     I don't think so.

22       Q.     Okay.  And when were those two prototypes

23   first built?

24       A.     Between April and August of 2000.

25       Q.     Do you know exactly when those two

1  prototypes were built?

2      A.      I don't.  I don't have that good a memory.

3      Q.      Do you have any documents that could

4  support when you first built those two prototypes?

5      A.      Just the notarized documents here.

6      Q.      Okay.  What about any -- well, I'll

7  withdraw that.

8          Are either of those first two prototypes

9  that you built this prototype that's sitting in

10 between the two of us?

11     A.      Yes, that's one of them.

12     Q.      One of them?  And how do you know that?

13     A.      Because I recognize it as my workmanship

14 and parts and pieces I remember using.  And I

15 remember labeling it.

16          About two years ago I put this sticker on

17 there, which is a sticker we were using on a lot of

18 our products, as indicated on this newer coupler

19 clamp there that's got the same sticker on it.

20     Q.      Okay.  And what support do you have -- or

21 how can you prove that this prototype here that's

22 sitting in front of us was built between April and

23 August of 2000?

24     A.      It's exactly like my notarized drawing.

25     Q.      Okay.  Anything else?

1   the last or third sentence in paragraph 9, and it

2   kind of goes along the lines of what you just stated,

3   but I just wanted to be clear.  It states, "For

4   example, the U-shaped shackle of the lock in my early

5   prototypes was an axle support bracket from an old

6   automobile part that I had available at my shop."

7           Do you see that?

8       A.      Yes.

9       Q.      And what you're talking about the axle

10  support bracket from -- in your declaration it says

11  automobile, but you're referring to a truck in your

12  shop.  Is that what you're talking about here?

13      A.      Yeah, I think more than likely that was

14  from the truck.

15      Q.      Okay.  I'm not going to hold you to

16  automobile, but the point being it was from a vehicle

17  of some sort?

18      A.      That's correct.

19      Q.      Okay.  I want to turn your attention to

20  paragraph 10 of your declaration.  And when you're

21  done reading it, just let me know.

22      A.      Okay.

23      Q.      Let's go to the first line there, it

24  states, "On numerous occasions, starting in

25  approximately August 2000 and continuing through at

1    least April 30, 2001 (more than 12 months prior to

2    the filing date of the '686 patent application), I

3    showed a prototype of my lock design that I had built

4    to numerous local dealers in St. George and in the

5    Greater Salt Lake City region for them to show to

6    their customers and to provide back to me input on my

7    design."

8              Do you see that?

9         A.    I do.

10        Q.    What I'm going to do is break it down,

11   otherwise we'll be here all day if we try to take it

12   as one sentence.  Let's start with the first portion

13   of this sentence, the first line, it states,

14   "starting in approximately August 2000 and continuing

15   at least through April 30, 2001," do you see that?

16        A.    I do.

17        Q.    How do you know that you started

18   approximately August 2000 to show a prototype to

19   numerous local dealers?

20        A.    Because I know around the August time

21   frame I had the drawings.  So I know that it was

22   around August of 2000 that I showed these dealers the

23   prototype.

24        Q.    And when you say you showed these dealers

25   this prototype, you're not talking about what

1   occurred in paragraph 11, do you?

2        A.    Yeah, those were the dealers.

3        Q.    So did you go back up to Salt Lake City,

4   then, to show these dealers your prototype?

5        A.    No.  I told you I went one time.

6        Q.    Okay.

7        A.    As I remember I went one trip.  You got to

8   understand at that time frame I was going to Salt

9   Lake every couple weeks.  So I don't know.  It seems

10  as if the time I actually took the sample and tried

11  it out on their lot was a one-trip deal.

12       Q.    Okay.  So the best of your knowledge one

13  time?

14       A.    That's right.

15       Q.    And that was in that August 2000 time

16  frame?

17       A.    Yes.

18       Q.    And most likely prior to the notarization

19  date of August 28th, 2000?

20       A.    That's correct.

21       Q.    And also on a Saturday, probably?

22       A.    I'm thinking it was a weekend.

23       Q.    A weekend.  Okay.

24             Which other dealers in this time frame,

25  other than the ones listed in paragraph 11, did you

1  show your prototype in the St. George or in the

2  Greater Salt Lake City region?

3       A.     I don't remember.  I think these are all

4  of them.

5       Q.     Okay.  It goes on to say, "for them to

6  show to their customers and to provide back to me

7  input on my design."

8              Do you see that?

9       A.     Yes.

10       Q.     And what do you mean by that?

11       A.     I wanted to see if they liked the product.

12  They felt that they are the customers would want to

13  purchase a product similar to this to lock up their

14  trailer.

15       Q.     And which dealers were they?

16       A.     Most of the input I got was from TJ's and

17  Dixie, because those are the ones that actually took

18  a closer look.

19       Q.     And you said "most."  Were there any

20  others?

21       A.     I think in real detail I think TJ's and

22  Dixie were the only ones that we had any real

23  discussion or detailed conversations about the lock.

24       Q.     And when was that?

25       A.     It was around August 2000.

1        Q.      Was it prior to your trip to Salt Lake

2     City?

3        A.      Yeah.   If I remember right, it seems like

4     the first time I met with them was before the trip.

5     And it seems as if I left them with a sample again

6     later after I come back.   And it seems like after I

7     had the notarized document that I left them the

8     sample, but I'm not positive.

9               As I remember it, I showed it to them,

10    went to Salt Lake, came back, got the notarized

11    documents, left them with the samples to do the test

12    marketing.

13       Q.      Okay.

14       A.      That's as I remember it.

15       Q.      And we're all sort of bunching here TJ's

16    and Dixie's here together.   I'll try to break it down

17    and see if there's a difference between the two.   And

18    we'll go with TJ's first.

19               Did you meet with TJ's before you went to

20    Salt Lake --

21       A.      Are you talking about TJ's U-Haul in

22    St. George, right?

23       Q.      Right, exactly, to be clear.

24       A.      Did I meet with them before Dixie?

25       Q.      No, let me rephrase that.

1              (Whereupon, a recess was taken at

2         11:05 a.m. to 11:16 a.m.)

3         MR. CUPAR:  We're back on the record here.

4    Q.    BY MR. CUPAR:  After TJ's gave back your

5    prototype to you and stated to you that you needed to

6    make refinements, did you make any refinements to

7    your prototype?

8    A.    Not to this one.  I started on a new one,

9    because it's too narrow to modify.

10   Q.    So --

11   A.    But not based on their refinements.  Their

12   refinements were maybe the suggestions of the twin

13   pin.  But the wider body was something I thought it

14   needed to fit more universally.  I decided to widen

15   the newer prototype, which is this second prototype,

16   the wide body here.

17   Q.    So to be clear, then, which Rimer brother,

18   Jon or James, told you to use the double bolt

19   mechanism?

20   A.    I don't recall.

21   Q.    But it's certainly one of them, right?

22   A.    Uh-huh.

23   Q.    And that's how you came up with that

24   portion of the idea?

25   A.    I've just been barely able to recognize

1    the difference between Jon or James.  A week or two

2    ago I ran into them.  A couple weeks ago I ran into

3    Jon in Mesquite and James was at a show.  I just

4    barely recognized who they were.

5         Q.      Okay.  But one of the Rimers told you to

6    include the double locking mechanism into --

7         A.      That's correct.

8         Q.      Okay.  Okay.

9                 And you said you were at this time frame

10   building another prototype; is that correct?

11        A.      I've got quite a few, yeah.

12        Q.      Well, let's start there, then.  At the

13   time that TJ's had in their possession --

14        A.      Oh, are you talking about right now?

15        Q.      Let's keep 2000.  And I want to make

16   sure that --

17        A.      Yeah, I was going I got quite a few.

18        Q.      Let's go back to the fall of 2000 when

19   TJ's had in their possession -- TJ's St. George had

20   in their possession one of these prototypes.  How

21   many -- were you building any other prototypes at

22   that time?

23        A.      No.

24        Q.      Okay.  And why not?

25        A.      It was a short time period.  It takes

1    quite a bit of time and work to build a prototype.

2    It basically is built by hand.  The first few were.

3    No, I wasn't working on anything else.

4         Q.     Okay.  Between the time you built the

5    first two prototypes in the spring or summer of 2000,

6    when was the next time you built another prototype?

7         A.     I worked on a crude prototype around the

8    April '01 date that became this that we used for a

9    pattern for the second wide body.  The second

10   prototype here on the table, which is the wide body.

11   I had a piece of steel instead of aluminum that was a

12   T shape, similar shape to what we have here.  It had

13   two holes through it and it had a U-shaped bent bar

14   similar to the shackle on the narrow body prototype,

15   except for this is one I actually bent.

16        Q.     Okay.

17        A.     That Richard and Mark at All Metals

18   Fabrication in Ogden, Utah his employees bent, I

19   don't remember how many bars, but they made a few of

20   them.  And they went into that prototype.  That

21   prototype was used to make sure that the product fit

22   on the wider body trailers.

23        Q.     Okay.  So, in other words, between --

24   well, between the spring or summer of 2000 and until

25   April -- around April 2001 when you first made your

1    designer Mark at IDS, which I mentioned his name,

2    when we sat down and started designing this, we had

3    all the tools and computers and 3-D and all the stuff

4    to really make the lock functional on the computer.

5    And at that point we were able to engineer the pins,

6    the cam, the parts, make everything work on the

7    computer, where we can then machine the parts and

8    make them work in real life.  On this one it was hard

9    enough just to get one pin to work, let alone two.

10        Q.    And just in that last phrase, you said "it

11   was hard enough to get one pin to work."  Were there

12   any difficulties in these prototypes to get one pin

13   to work?

14        A.    It was, because I didn't have anything on

15   computer.  It's just -- it was a work in progress,

16   just trial and error.

17        Q.    Does this one in front of me, does the

18   single pin in here work?

19        A.    It does.

20        Q.    Does it work consistently?

21        A.    It does.

22        Q.    Did you have any problems with it or

23   issues with it back in 2000, 2001, in terms of it

24   working?

25        A.    Not that I'm aware of.

1      A.       They worked.

2               MR. MULDOON:   Objection, asked and

3      answered.

4               THE WITNESS:   Limitedly.   They didn't fit

5      on every trailer made.   And I can't guarantee that

6      the product fits on everything we made.   As far as I

7      know, I haven't done one that doesn't.

8      Q.       BY MR. CUPAR:   And what I mean by "work,"

9      I don't mean by fitting different couplers.   I mean

10     fitting getting the locking mechanism to work,

11     getting the pin to actually meet the shackle, those

12     kind of things.   Were you able to get that all to

13     work initially?

14     A.       Yeah, I would say it was a success.

15     Q.       And why is that?

16     A.       Because it did the job it functioned.   It

17     fit.   It worked.   It locked onto the coupler.   That's

18     what the intention was.   It worked.   There's a

19     picture of it included in here somewhere.

20     Q.       And let's talk about that picture.   I

21     think I know which one you're talking about.   Going

22     back to paragraph 10 of your declaration, which is

23     Plaintiff's Exhibit 5, I'm going to read out loud the

24     last sentence.   I'm going to talk about this last

25     sentence in paragraph 10 with you.

1       A.      Yes.

2       Q.      Just to be clear, what's the Budge

3   drawing?

4       A.      Budge drawing would be probably referring

5   to the notarized document that Diane McDaniel signed

6   on 8-28, 2000 as Defendant's Exhibit 1.

7       Q.      And then prototype, what prototype are you

8   referring to there in that header?

9       A.      Probably the narrow body first prototype

10  here.

11      Q.      The one at the table here?

12              MR. CUPAR:  Okay.  Let's take a lunch

13  break.  It's 12:10.  Off the record.

14              (Whereupon, a recess was taken at

15              12:08 p.m. to 2:08 p.m.)

16              MR. CUPAR:  Let's begin.

17      Q.      BY MR. CUPAR:  Mr. Budge, I want to start

18  with Plaintiff's Exhibit 2, which is this original

19  copy, notarized copy, of the trailer tongue coupler

20  lock device.

21      A.      Okay.

22      Q.      Do you see it?  Do you have it in front of

23  you?

24      A.      I do.

25      Q.      Okay.  Take a look at the top left corner

1    of that document.  Do you see a hole in the page?

2         A.      Yeah.

3         Q.      Why is that?

4         A.      I think at one time it may have been

5    copied to a cover page, or something.

6         Q.      And what was the contents of that?

7         A.      Or to other documents relating to, you

8    know, other coupler lock drawings, you know, that I

9    had.  Because I had the newer -- some newer drawings

10   on newer versions for parts.  I don't know.  It's

11   been that way for years.  I think.

12              MR. MULDOON:  And for the record I believe

13   I put a piece of tape over it so it didn't rip any

14   further.

15              THE WITNESS:  It looks to me like it was

16   stapled at some time.

17        Q.      BY MR. CUPAR:  Do you know what it was

18   stapled to?

19        A.      I don't.

20        Q.      Take a look at Exhibit 2 at the bottom

21   there, do you see a No. 2 there in the middle of the

22   page?

23        A.      Oh, this No. 2?

24        Q.      Can I see your document, please?

25        A.      I don't see a No. 2 anywhere.

1       A.      They do.

2       Q.      Okay.  What about Dixie Automotive, does

3    it sell Diversi-Tech products?

4       A.      Yes.

5       Q.      Okay.  And do you sell to Dixie?

6       A.      No.  I sell to Carter's and national

7    distributors.  They sell to Dixie.

8       Q.      Okay.

9       A.      We have never sold to a dealer ever.

10      Q.      When's the first time you talked to Brian

11   Musgrave?

12              MR. MULDOON:  Objection to form.

13              THE WITNESS:  When was the last time?

14      Q.      BY MR. CUPAR:  The first time.

15      A.      The first time?  I don't know how well I

16   really knew him in 2000, because I knew Larry more

17   than him.  But I got to know him over the years.  I'd

18   say maybe the end of 2000, first part of '01.

19      Q.      And when's the last time you spoke with

20   him?

21      A.      Today.

22      Q.      And when was that?

23      A.      At lunch.

24      Q.      Did you have lunch with him?

25      A.      No.

1      Q.      What did you talk about?

2      A.      I just went over there and asked them if

3 they were going to show up.  Brian indicated that he

4 wasn't coming, that him and Larry couldn't leave at

5 the same time.  So according to him Larry was the

6 only one coming.

7      Q.      Tomorrow?

8      A.      Tomorrow.

9      Q.      And Brian's not coming?

10     A.      That's what he said.

11     Q.      Okay.  Only Larry's coming?

12     A.      I think you might want to call Larry, too,

13 because he acted like he didn't even though what time

14 he's supposed to be here.

15             THE WITNESS:  Unless you want to call him,

16 Jim, remind him.

17     Q.      BY MR. CUPAR:  We'll take a break in a few

18 minutes and make sure that they both show up.

19             So the last time was today, and you talked

20 about showing up.  Did you guys talk about anything

21 else?

22     A.      No.

23     Q.      Did you guys --

24     A.      I only talked for like two minutes.  Just

25 asked him if they were going to show up.  He said no.

1    Larry was helping a customer.  I asked him if he was

2    going to show up.

3               I'm going to show up.  Do you know what

4    time it is?

5               I have no clue.

6               He said something they served the papers

7    wrong and said it was Friday, and they didn't get

8    them until Monday, or something like that.  And that

9    was the end of it.  He went off and measured some

10   guy's thing and I drove off.

11        Q.    And prior to today when's the last time

12   you talked to Brian or Larry Musgrave?

13        A.    Months.

14        Q.    How many months ago?

15        A.    About the time we did their declarations,

16   which I have no idea what that date was.  But I'm

17   sure we could look it up.  I gave them a copy.  They

18   signed it.  I gave them a copy of it.  That was the

19   last time I talked to them.

20        Q.    Okay.  And that's for both of them, right?

21        A.    For?

22        Q.    For both Brian and Larry Musgrave?

23        A.    That's correct.

24        Q.    Okay.  And prior to the April 2005

25   declarations that Larry and Brian signed, how often

1    and if I'm wrong you can let me know at a different

2    date.

3        A.      I really don't think there's anything

4    in '01, you know, any kind of paperwork that would

5    prove we used the name in '01.  It was just a name.

6        Q.      And how were you using it in early '01 as

7    a name?

8        A.      I don't think I was technically using it

9    at all.

10       Q.      When did you begin using it?

11       A.      In '02.  I definitely was using it in '02

12   because that's when I started using the logo on the

13   packages.

14       Q.      Okay.  I'm going to show you now an

15   exhibit here.

16               (Whereupon, Plaintiff's Exhibit 9

17                was marked for identification.)

18       Q.      BY MR. CUPAR:  I'm going to hand to you

19   now what's been marked as Plaintiff's Exhibit 9.

20       A.      Okay.

21       Q.      The first page is a printout from the

22   United States Patent and Trademark Office of a word

23   mark named DT or Diversi-Tech.

24       A.      Okay.

25       Q.      Do you see that?

1   whatever.

2              MR. MULDOON:  Okay.

3       Q.    BY MR. CUPAR:  Take a look at DT 813,

4   which is page 3 of 4 of this document.

5       A.    Okay.

6       Q.    Take a look at the fourth full paragraph

7   and read it.  And let me know when you're ready.

8       A.    Okay.  I think I'm reading the right

9   paragraph.

10             MR. MULDOON:  Which paragraph?

11             THE WITNESS:  I think he said the fourth

12  full one?

13      Q.    BY MR. CUPAR:  Yes.  Just to be clear,

14  it's the one that states, "The importance of this

15  three-way."  Is that the one you read?

16      A.    It is.

17      Q.    Okay.  I want you to look at the third

18  sentence which starts, "Both this device."  Do you

19  see that sentence?

20      A.    Yeah.  "Both this device."

21      Q.    Okay.  I'm going to read this.  "Both this

22  device and the Cequent commercial model failed when

23  struck only lightly with a hammer at a forty-five to

24  ninety degree angle."

25             Do you see that?

1        A.      I do.

2        Q.      When did you determine that model -- or,

3   excuse me, that this device of yours failed when only

4   struck lightly with a hammer?

5        A.      I think Tom actually made a little bit of

6   a typo here, because he kind of ties --

7                MR. MULDOON:  I don't --

8                THE WITNESS:  -- this in with that.

9                MR. MULDOON:  I'm going to instruct you

10  not to answer anything about the letter at this

11  point.  If you want to talk about the tests, that's

12  fine.

13               THE WITNESS:  Okay.  I'll tell you about

14  the test.  But the letter is not accurate.

15               The testing was done in approximately 2003

16  when -- actually when we saw the Cequent lock for the

17  first time, we got our hands on one, tested it and

18  tested our own, which is the one we currently sell,

19  with a single pin, and they both failed.

20       Q.      BY MR. CUPAR:  When did this occur?

21       A.      In approximately 2003.

22       Q.      2003?

23               And you only had one prototype from back

24  then, and that would have been if you tested off of

25  this one?

1     A.     No, we had this one that we started

2  working on in late '02.

3     Q.     In late '02.  So this one is this wide

4  body device here?

5     A.     That's correct.

6     Q.     And you tested -- now, this wide body

7  device has a single --

8     A.     No, it has a dual, but we tested it with a

9  single to see what the feasibility if we could get

10  away with it, with using a single locking side such

11  as Cequent's.

12     Q.     Let me back up.  Before it says,

13  "Substantially prior to the date the patent

14  application of Cequent was filed, Diversi-Tech had

15  conceived of a two-way lock with a bolt acting on

16  only one leg of the locking bar and reduced this to

17  practice by creating a working device."

18          Do you see that?

19          MR. MULDOON:  At this point I'm going to

20  go ahead and deliver this handwritten letter to David

21  Cupar, Cequent versus Diversi-Tech, as an

22  inadvertently produced privileged document, DT 00811

23  to 814.  I hereby demand withdrawal of the document

24  in accordance with the protective order, signed

25  James R. Muldoon.  I have given you notice of the

1    ambitious, doesn't want to try to manually force it

2    off.  That's what locks really do is keep the honest

3    honest, right?

4        Q.    So, in other words, the lock should stay

5    on when some burglar is trying to take it off?

6        A.    It could be better.  I think you could get

7    more money out of a product that has much more of a

8    physical deterrent as well as a visual deterrent.

9        Q.    And you said before that for this

10   prototype in front of us and for the other prototype

11   in 2000 you never tested it, right?

12            MR. MULDOON:  Objection, form, compound.

13            THE WITNESS:  I never tested the original

14   prototype for hammer blows, physically tested it, you

15   know, with my hands to see how well it held on.  So,

16   yes, there was some testing done with originals.

17       Q.    BY MR. CUPAR:  Well, do you have any

18   documentation of that?

19       A.    No.

20       Q.    And if theft deterrence is such an

21   important thing, why didn't you test your original

22   prototypes then?

23       A.    Because I didn't have the shackle style

24   that I wanted, the bigger teeth, like on product

25   No. 2 here, sample 2 here, the wide body.  Notice how

1    large the teeth are?  Very, very large and very wide

2    spaced.

3        Q.     Just so the record's clear again because

4    we're doing this in writing -- by the way, this wide

5    body, so we have it in this section, came after

6    May 1st, 2002; is that right?

7        A.     Yes.

8        Q.     Okay.

9        A.     Well, yeah.  Yeah, this one did.

10       Q.     So the one you're showing me, this wide

11   body, after May 1, 2002 has got larger teeth on the

12   shackle or on the sides of the shackle that go into

13   this aperture on the body; is that right?

14       A.     That's correct.

15       Q.     What's the importance of these larger

16   teeth?

17       A.     Well, the problem with smaller teeth is

18   you got to be super precise.  The thing has to be

19   right on the money.  The teeth have to line up.  The

20   slide pin has to engage it perfectly.  If you've got

21   a bigger tooth like this, the tolerance in the

22   machining can be as sloppy as 20, 30 thousandths.

23   The machine tolerance to try to hook on a groove this

24   small, as I'm pointing to the original prototype now,

25   the grooves here are very small.  They're probably

1   only 30 thousandths of an inch deep.  Well, maybe 25

2   thousandths.  The ones on the wide body here are

3   approximately a hundred thousandths, 125 thousandths,

4   deep.

5        Q.    So, in other words, the bigger -- yeah,

6   the bigger the teeth, the better the locking, in a

7   nutshell?

8        A.    The better of a chance of it being engaged

9   properly.

10       Q.    Therefore, the better the locking?

11       A.    Better the lock.  And it costs a lot to

12   develop the type of tolerance to make this work

13   properly.  You would have to precision machine this

14   product to work as good as this one.  There's more

15   teeth here.  In essence, you have more surface area

16   to catch over a wider area.  But it has to be

17   perfectly matched.

18       Q.    And when you say "it has to be perfectly

19   matched," what you're talking about was this

20   prototype on this table, right?

21       A.    That's correct.  And I knew it wasn't

22   matched enough to do any good testing.

23       Q.    So you knew without having to test it that

24   this model that we have in front of us doesn't work

25   well?

1              MR. MULDOON:  Objection to form.

2              THE WITNESS:  I wouldn't say it doesn't

3    work well.  I would say it doesn't work as good as I

4    would like, or as good as I know it could work.

5         Q.    BY MR. CUPAR:  Would you be able to sell

6    this to someone in good faith and tell them, yeah,

7    you can lock your boat up with this?

8              MR. MULDOON:  Objection to form.

9              THE WITNESS:  Sure.

10        Q.    BY MR. CUPAR:  You would have no problem

11   with this prototype in front of us?

12        A.    No.

13        Q.    And you said that the teeth -- going back

14   to this wide body prototype here, the one after

15   May 1st --

16        A.    Can I clarify something?

17        Q.    Sure, absolutely.

18        A.    If you notice on the package of our final

19   product here, maximum security coupler lock is listed

20   at the top.

21        Q.    Okay.

22        A.    This is a package of a lock we took out of

23   my shop today.  We've been using the word "maximum

24   security" since the first part of 2003.  That's when

25   we started using the locking and blocking feature and

1    the twin pins.  We called this a maximum security

2    lock because it has a much stronger interlock system.

3        Q.    So in 2003 you were making improvements to

4    this locking device; is that right?

5        A.    From all the way from 2000, from the

6    original concept I've been improving it, clear up to

7    2003.  And now we did a new improvement in 2005.

8        Q.    And why did you make improvements on the

9    2000 prototypes if they worked?

10       A.    Because people wouldn't pay the money if

11   they didn't think it was as secure as it could be.

12             People pay top dollar for a maximum

13   security coupler lock.  So we're in the business of

14   selling a high quality product we can get top dollar

15   out of.  So I developed a lock that would withstand

16   severe hammer blowing and the locking engagement will

17   handle it.

18       Q.    But, however, this prototype lock between

19   us from 2000 here, you don't know whether or not it

20   can engage a hammer blow, do you?

21       A.    It was never tested physically with a

22   hammer, no.

23       Q.    So you don't know?

24       A.    No.

25       Q.    Okay.  Let's go back to your letter here.

1       A.      Okay.

2       Q.      Continue with that same paragraph, about

3  little more than halfway down in the paragraph.  In

4  fact, I'll just count the lines from the bottom.

5  One, two, three, four, five -- ten lines from the

6  bottom.  Let me know when you get there.  The first

7  word on the tenth line from the bottom is "but."

8       A.      Okay.

9       Q.      Okay.  At the end of that line there's a

10 new sentence and it starts, "In our initial product

11 testing we used springs that were so stiff that it

12 was almost impossible to turn the key."

13              Do you see that?

14      A.      Maybe I'm on the wrong "but."

15              MR. MULDOON:  10 up from the bottom.

16              THE WITNESS:  From that first paragraph,

17 correct?

18      Q.      BY MR. CUPAR:  Correct.

19      A.      "But this design"?

20      Q.      Yes.

21              MR. MULDOON:  Then he wants you to go to

22 the finishing of the sentence at the end of the line.

23              THE WITNESS:  "In our official product

24 testing we used springs that were so stiff that it

25 was almost possible to turn the key."

1    haven't shared."  Do you see that?

2        A.      "I haven't shared these findings with our

3    distribution network and I probably never will as

4    long as I am continuing to sell my product at a rate

5    ten to every one Fulton, Masterlock, or Trimax lock

6    sold in my distribution network."

7        Q.      My question is this:  What do you mean by

8    that sentence?

9        A.      I mean that the distributors that sell my

10   product sell 10 of mine to every one of my

11   competitor's products.

12       Q.      Just to be clear on your answer, you

13   didn't understand my question based on that answer.

14   I guess what I'm asking, I haven't shared my findings

15   with my distribution network, why haven't you shared

16   these findings?

17       A.      About the spring bias?

18       Q.      About anything.  What findings --

19       A.      The findings I'm talking about is the

20   spring biased --

21       Q.      Okay.

22       A.      -- lock.

23              I'm going to give you an example what I'm

24   talking about.  According to the news, you can put a

25   pen cap in these round lock cylinders and if you turn